CK 55097

RECEIVED

DEC 28 2004

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MICHAEL SPIZIRI, On Behalf of Himself and All Others Similarly Situated,

Plaintiff,

v.

THE ST. PAUL TRAVELERS COMPANIES, INC. f/n/a THE ST. PAUL COMPANIES, INC., JAY S. FISHMAN, THOMAS A. BRADLEY, CAROLYN H. BYRD, JOHN H. DASBURG, JANET DOLAN, KENNETH M. DUBERSTEIN, LAWRENCE G. GRAEV, THOMAS R. HODGSON, WILLIAM H. KLING, JAMES A. LAWRENCE, JOHN A. MacCOLL, GLEN D. NELSON, GORDON M. SPRENGER, and JOHN DOES 1-20,

Defendants.

:
:
: **CIVIL ACTION NO.:**
: 04.5096 JRT|FLN
: **CLASS ACTION COMPLAINT**
: **FOR VIOLATIONS OF THE**
: **EMPLOYER RETIREMENT**
: **INCOME SECURITY ACT**
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Plaintiff Michael Spiziri, a participant in the St. Paul Travelers Companies, Inc.'s 401K savings plan (the "Plan"), on behalf of himself and a class of all others similarly situated, allege as follows:

## INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries, including The St. Paul Travelers Companies, Inc. (f/n/a The St. Paul Companies, Inc.) ("St. Paul" or the "Company").

2.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. Employees participating in

SCANNED

DEC 29 2004

U.S. DISTRICT COURT MPLS

plan may have the option of purchasing the common stock of, or other investment options created by, their employer, often the sponsor of the plan, for part of their retirement investment portfolios. Company stock is an investment alternative in the Plan

3.      Plaintiff was an employee of St. Paul and a participant in the Plan during the Class Period. Plaintiffs retirement investment portfolio included St. Paul stock during the Class Period.

4.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to plaintiff and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of St. Paul common stock ("St. Paul Stock" or "Company Stock").

5.      During the Class Period, as described herein, Defendants knew or should have known that St. Paul stock was an imprudent investment alternative for the Plan due to the rampant business improprieties occurring at the Company. Upon information and belief, certain Defendants played an active role in implementing the business improprieties described herein to artificially inflate the value of Company stock during the Class Period.

6.      Defendants are liable under ERISA to restore losses sustained by the Plan as a result of their breaching of their fiduciary obligations.

## NATURE OF ACTION

7.      On March 19, 2004, holders of Travelers' Class A and Class B common stock, relying on the information contained in the Proxy Statement/Prospectus, voted to

approve the Merger and received 0.4334 shares of St. Paul common stock for each share of Travelers' Class A or Class B common stock they owned. After the Merger, St. Paul changed its name to St. Paul Travelers.

8.     On July 23, 2004, barely four months after the Merger received shareholder approval and became effective, St. Paul Travelers issued a press release, announcing that certain conditions relating to St. Paul and existing at the date of the Registration Statement and Proxy Statement/Prospectus, February 13, 2004, required the Company to increase its reserves by $1.625 billion. Specifically, St. Paul Travelers revealed in the July 23, 2004 press release that the Company was required to (a) adjust and increase its reserves by $1.17 billion, so as to conform the accounting and actuarial methods of St. Paul to those of Travelers; and (b) increase its reserves by an additional $455 million, due to St. Paul's existing exposure to the adverse financial condition of a construction contractor, a reduction in reinsurance recoverables, and other similar conditions.

9.     In contrast to the July 23, 2004 press release, the Registration Statement and Proxy Statement/Prospectus stated that the adjustments required to conform accounting and actuarial methods of St. Paul to those of Travelers would result in a reduction of the Company's reserves by $720 million. Moreover, the Registration Statement and Proxy Statement/Prospectus failed to disclose that existing conditions relating to St. Paul would require the additional $455 million increase of reserves.

10.     Subsequently, on August 5, 2004, St. Paul Travelers reported that the required reserve adjustments for St. Paul would be $1.637 billion, resulting in an

3

operating loss of $310 million or $0.47 per basic and diluted share for the Company in the second quarter ended June 30, 2004.

11.    The market reacted negatively to the post-merger revelation about the true extent of increase of reserves that was required by the Merger, and reduced its valuation of St. Paul's common stock to reflect the previously undisclosed material information.  The per share closing price of St. Paul common stock was $40.77 on April 1, 2004, the date on which each share of Travelers' Class A and Class B common stock was exchanged for 0.4334 shares of St. Paul common stock.  By the time the true extent of the required reserve increase and its adverse impact on St. Paul Travelers were fully disclosed to the market on August 5, 2004, the per share price of St. Paul common stock had declined by $6.02 or 14.77% to close at $34.75 per share on August 5, 2004 - causing massive losses to former Travelers shareholders.

12.    As a result of Defendants' materially false and misleading statements and omissions in the Proxy Statement/Prospectus, the value of shares of St. Paul common stock was artificially inflated.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).

14.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 20 U.S.C. § 1132(e)(2), because this is the district where the breaches took place, where one or more defendants reside or may be found, or where the acts and transactions alleged

herein, including the preparation and dissemination of materially false and misleading
information, occurred.

## PARTIES

15.     Plaintiff Michael Spiziri was a St. Paul employee, a participant in the Plan
pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held St. Paul stock in his
retirement investment portfolio during the Class Period.

16.     Defendant St. Paul Travelers is a public company organized under the
laws of Minnesota.  St. Paul Travelers' principal executive offices are located at 385
Washington Street, St. Paul, Minnesota 55102.  Prior to the April 1, 2004 Merger,
Defendant St. Paul Travelers was known as St. Paul, the issuer of the shares pursuant
to the Registration Statement, and shares of its common stock actively traded on the
New York Stock Exchanged under the ticker symbol, "SPC."  After the April 1, 2004
Merger, the Company changed its name to St. Paul Travelers, and shares of its
common stock continue to be actively traded on the New York Stock Exchange under
the new ticker symbol, "STA."  Defendant St. Paul Travelers is a leading provider of
commercial property liability insurance and asset management services.  The Company
is the second largest insurance company in the U.S.

17.     Defendant Jay S. Fishman ("Fishman") served as the Chairman,
President and Chief Executive Officer of St. Paul from October 2001 until the April 1,
2004 Merger.  Additionally, Defendant Fishman signed the Registration Statement.
After the April 1, 2004 Merger, Defendant Fishman became the Chief Executive Officer
and a director of the Company, as combined.  Before joining St. Paul, Defendant

5

Fishman had served as the Chairman, President and Chief Executive Officer of The
Travelers Insurance Group Inc., the parent company of Travelers, since 1993. Fishman
was a fiduciary of the Plan within the meaning of ERISA in that he exercised
discretionary authority with respect to management and administration of the Plan
and/or management and disposition of the Plan's assets.

18.     Defendant Thomas A. Bradley ("Bradley") served as the Executive Vice
President and Chief Financial Officer of St. Paul from July 2002 until the April 1, 2004
Merger. Defendant Bradley signed the Registration Statement. After the April 1, 2004
Merger, Defendant Bradley became Executive Vice President, Finance, of the
Company. Bradley was a fiduciary of the Plan within the meaning of ERISA in that he
exercised discretionary authority with respect to management and administration of the
Plan and/or management and disposition of the Plan's assets.

**Director Defendants**

19.     Defendant Carolyn H. Byrd ("Byrd") served as a director of St. Paul from
May 2001 until the March 1, 2004 Merger. Additionally, Defendant Byrd signed the
Registration Statement. Byrd was a fiduciary of the Plan within the meaning of ERISA
in that he exercised discretionary authority with respect to management and
administration of the Plan and/or management and disposition of the Plan's assets.

20.     Defendant John H. Dasburg ("Dasburg") served as a director of St. Paul
from February 1994 until the March 1, 2004 Merger. Additionally, Defendant Dasburg
signed the Registration Statement. Dasburg was a fiduciary of the Plan within the
meaning of ERISA in that he exercised discretionary authority with respect to

6

management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     Defendant Janet M. Dolan ("Dolan") served as a director of St. Paul from May 2001 until the March 1, 2004 Merger. Additionally, Defendant Dolan signed the Registration Statement. Dolan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22.     Defendant Kenneth M. Duberstein ("Duberstein") served as a director of St. Paul from May 1998 until the March 1, 2004 Merger. Additionally, Defendant Duberstein signed the Registration Statement. Duberstein was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     Defendant Lawrence G. Graev ("Graev") served as a director of St. Paul from May 2002 until the March 1, 2004 Merger. Additionally, Defendant Graev signed the Registration Statement. Graev was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24.     Defendant Thomas R. Hodgson ("Hodgson") served as a director of St. Paul from August 1997 until the March 1, 2004 Merger. Additionally, Defendant Hodgson signed the Registration Statement. Hodgson was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to

7

management and administration of the Plan and/or management and disposition of the Plan's assets.

25.     Defendant William H. Kling ("Kling") served as a director of St. Paul from November 1989 until the March 1, 2004 Merger. Additionally, Defendant Kling signed the Registration Statement. Kling was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26.     Defendant James A. Lawrence ("Lawrence") served as a director of St. Paul from May 2003 until the March 1, 2004 Merger. Additionally, Defendant Lawrence signed the Registration Statement. Lawrence was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the St. Paul Plan and/or management and disposition of the Plan's assets.

27.     Defendant John A. MacColl ("MacColl") served as a director of St. Paul from May 2002 until the March 1, 2004 Merger. Additionally, Defendant MacColl signed the Registration Statement. MacColl was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     Defendant Glen D. Nelson ("Nelson") served as a director of St. Paul from May 1992 until the March 1, 2004 Merger. Additionally, Defendant Nelson signed the Registration Statement. Nelson was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

8

29.    Defendant Gordon M. Sprenger ("Sprenger") served as a director of St. Paul from May 1995 until the March 1, 2004 Merger. Additionally, Defendant Sprenger signed the Registration Statement. Sprenger was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

30.    Defendants in paragraphs 17-29 are collectively referred to herein as the "Individual Defendants."

31.    Defendants in paragraphs 19-29 are collectively referred to herein as the "Director Defendants."

32.    St. Paul is the Plan Sponsor. St. Paul sponsors a voluntary savings plan for domestic employees (the St. Paul 401(k) plan), provided for salary reduction contributions by employees and matching contributions by St. Paul of up to 50% (in increments of 1%) of their eligible compensation as pre-tax contributions into the Plan (subject to statutory limitations of $12,000 and $11,000 for 2003 and 2002, respectively) as defined in the Plan.

33.    St. Paul is a fiduciary of the Plan within the meaning of ERISA. St. Paul exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. St. Paul at all times acted through its officers and employees, including its Chief Executive Officer ("CEO") and members of its Board oversight to perform St. Paul's Plan-related fiduciary functions in the course and scope of their employment.

9

34.   St. Paul had, at all applicable times, effective control over the activities of its officers and employees, including over their St. Paul Plan-related activities.  St. Paul, through its Board of Directors, Executive Officers or otherwise, had the authority and discretion to hire and terminate said officers and employees.  St. Paul, through its Board and otherwise, also had the authority and discretion to appoint, monitor, and remove Directors, Officers and other employees from their individual fiduciary roles with respect to the Plan.  By failing to properly discharge their fiduciary duties under ERISA, such Defendant-fiduciaries breached duties they owed to Participants in the Plans and their beneficiaries.  Accordingly, the actions of these fiduciaries are imputed to St. Paul under the doctrine of respondent superior, and St. Paul is liable for such actions.

**Unknown Fiduciaries**

35.   There are fiduciaries of the Plan whose identities are currently unknown to Plaintiff.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

36.   Defendants include named and de facto fiduciaries with respect to the Plan.  All Defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

**THE PLAN**

37.   The St. Paul Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. § 1002(3) and 1002(2)(A).  The St. Paul Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(l), 29 U.S.C. § 1132(d)(l).

10

However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a Defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the  relief requested in this action is for the benefit of the Plan.  Stated differently, in this action, Plaintiff, who is described above, seeks relief on behalf of the Plan.

## DEFENDANTS' FIDUCIARY STATUS

38.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

39.     During the Class Period, the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

40.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, St. Paul chose to internalize its respective fiduciary functions.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the
> Plan at any time between April 2, 2004 to the present (the
> "Class Period) and whose accounts held Company stock.

42.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there

are, at a minimum thousands of members of the Class who participated in, or were beneficiaries of the Plan during the Class Period

43.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      a.    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

      b.    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

      c.    whether Defendants violated ERISA; and

      d.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

45.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.    Class action status in this ERISA action is warranted under Rule 23(b)(I)(B) because prosecution of separate actions by the members or the Class would

12

create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class  parties to the actions, or substantially impair or impede their ability to protect their interests

47.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' CONDUCT

48.     Before the Merger, St. Paul was a company that provided general and specialty commercial property and casualty insurance and asset management services. Travelers was a leading property and casualty insurance company in the U.S., providing a wide range of commercial and personal property and casualty insurance products and services.

49.     On November 17, 2003, St. Paul and Travelers issued a joint press release, announcing their definitive agreement to merge in a stock-for-stock transaction.

13

50.   The Merger was to be structured as a merger of Travelers with a newly formed wholly-owned subsidiary of St. Paul, with Travelers surviving as a wholly-owned subsidiary of St. Paul. In the Merger, St. Paul was to change its name to St. Paul Travelers.

51.   Holders of Travelers Class A and Class B common stock would receive, in exchange for each of their Travelers shares, 0.4334 shares of St. Paul common stock. Upon consummation of the Merger, former Travelers shareholders would own approximately 66% of the outstanding shares of the combined company, while existing St. Paul shareholders would own approximately 34% of the combined company.

52.   The Proxy Statement/Prospectus, dated February 13, 2004, along with notices of two special stockholders meetings scheduled for March 19, 2004, at which the holders of shares of Travelers Class A and Class B common stock and St. Paul common stock would respectively vote on the Merger, was delivered to Travelers and St. Paul shareholders on or about February 17, 2004. The Proxy Statement/ Prospectus was filed with the SEC as part of the Registration Statement amended and filed with the SEC on February 13, 2004 by St. Paul. The Registration Statement was signed by each of the Individual Defendants, and was declared effective by the SEC on February 13, 2004.

53.   According to the Proxy Statement/Prospectus, the Merger "will be accounted for as a reverse acquisition with Travelers as the accounting acquirer. Accordingly, St. Paul Travelers will account for the [Merger] transaction as a purchase business combination, using Travelers historical financial information and accounting

14

policies and applying fair value estimates to the acquired assets, liabilities and

commitments of St. Paul as of the date of the transaction."

54.     The Proxy Statement/Prospectus provided historical balance sheets of

both St. Paul and Travelers, individually as of September 30, 2003. The Proxy

Statement/Prospectus also included an unaudited pro forma condensed combined

balance sheet as of September 30, 2003, which combined the historical consolidated

balance sheets of St. Paul and Travelers, giving effect to the Merger as if it had been

consummated on September 30, 2003.

55.     In connection with the pro forma condensed combined balance sheet, St.

Paul represented in the Proxy Statement/Prospectus that:

> The preliminary unaudited pro forma condensed combined
> financial statements have been prepared assuming that the
> merger is accounted for under the purchase method of
> accounting (referred to as purchase accounting) with
> Travelers as the acquiring entity. Accordingly, under
> purchase accounting, the assets, liabilities and commitments
> of St. Paul are adjusted to their fair value. For purposes of
> these preliminary unaudited pro forma condensed combined
> financial statements, consideration has also been given to
> the impact of conforming St. Paul's accounting policies to
> those of Travelers . . . . The preliminary unaudited pro
> forma adjustments represent management's estimates
> based on information available at this time.

56.     Among other things, the pro forma condensed combined balance sheet

included a line item under "Liabilities" relating to "Claims and claim adjustment expense

reserves." Claims and claim adjustment expense reserves are important figures for

insurance companies such as St. Paul and Travelers because they represent estimates

of the amounts that an insurance company pays or expects to pay to insurance

policyholders and the costs of investigating, resolving and processing insurance claims.

15

The reserves reflect estimates of total claims and associated costs that an insurance company will ultimately have to pay under the insurance policies, surety bonds and reinsurance agreements. As described in the Proxy Statement Prospectus, "[t]hese reserve estimates represent management's expectation of what the ultimate settlement and administration of claims will cost based on an assessment of facts and circumstances then known, review of historical settlement patterns, estimates of trends in claims severity and frequency, changing legal theories of liability and other factors."

57.    Specifically, the "Claims and claim adjustment expense reserves" line under "Liabilities" in the pro forma condensed combined balance sheet, as contained in the Proxy Statement/Prospectus, stated in relevant part:

### UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET
### At September 30, 2003

|  | Historical Travelers | Historical St. Paul | Pro Forma Adjustments | Pro Forma St. Paul Travelers |
|---|---|---|---|---|
|  |  | (in millions) |  |  |
| Claims and claim adjustment expense reserves | $ 33,854 | $ 22,389 | $ (720) | $ 55,523 |

According to the Proxy Statement/Prospectus, the $720 million of reduction in reserves for the combined company "[r]epresents adjustments to conform St. Paul's accounting policy to that of Travelers" as well as "adjustments for fair value."

58.    The foregoing statements in ¶¶ 55-57 were materially false or misleading for failing to disclose, inter alia, the following then-existing conditions and facts:

a.    There were significant disparities between the accounting and actuarial methods of St. Paul and Travelers. Among other things, St. Paul's accounting and actuarial methods were less conservative than Travelers. To conform St. Paul's

16

accounting and actuarial methods to those of Travelers - as required under the purchase method of accounting because Travelers was the accounting acquirer in the reverse acquisition - the "Claims and claim adjustment expense reserves" for St. Paul Travelers would have to be adjusted upwards by $1.171 billion, rather than being adjusted downwards by $720 million;

      b.     St. Paul's exposure to the adverse financial condition of a construction contractor, a reduction in reinsurance recoverables, and others similar conditions required the "Claims and claim adjustment expense reserves" for St. Paul Travelers to be adjusted upwards by an additional $466 million; and

      c.     The $1.637 billion of required increase in reserve under the Merger would require St. Paul Travelers to record a significant charge to its income statement, adversely impacting earnings.

      59.     The market was unaware of the undisclosed material facts when the Merger was completed on April 1, 2004. Reporting on the completion of the Merger, an April 1, 2004 Bloomberg article observed that "[s]hares of St. Paul rose 84 cents to $40.85, while Travelers gained 44 cents to $17.59 in New York Stock Exchange composite trading at 11:18 a.m."

      60.     Immediately following the completion of the Merger on April 1, 2004, analysts Thomas V. Cholnoky at Goldman Sachs & Co. and Todd Bault at Sanford C. Bernstein & Co., among others, rated St. Paul Travelers as "Outperform."

      61.     In his April 22, 2004 report on St. Paul Travelers, analyst Bijan Moazarni at Friedman, Billings, Ramsey & Co., Inc. stated that, "[w]e believe the merger works for

17

a number of reasons . . .  the companies are similar.  <u>Both companies are now</u>

<u>adequately reserved . . . .</u>" (emphasis added).

62.     On July 23, 2004, St. Paul Travelers issued a surprising press release,

announcing that certain conditions relating to St. Paul required the Company to

increase its reserves by $1.625 billion.  Specifically, St. Paul Travelers revealed in the

July 23, 2004 press release that the Company was required to (a) adjust and increase

its reserves by $1.17 billion, so as to conform the accounting and actuarial methods of

St. Paul to those of Travelers; and (b) increase its reserves by an additional $455

million, due to St. Paul's existing exposure to the adverse financial condition of a

construction contractor, a reduction in reinsurance recoverables, and other similar

conditions.

63.     The July 23, 2004 press release stated in relevant part:

> SAINT PAUL, Minn.--(BUSINESS WIRE)--July 23,
> 2004--The St. Paul Travelers Companies, Inc. (NYSE :STA -
> News; St. Paul Travelers) was formed on April 1, 2004,
> when Travelers Property Casualty Corp.  (Travelers) and
> The St. Paul Companies, Inc. (St. Paul) completed the
> previously announced merger.  For accounting purposes,
> Travelers is the accounting acquirer.  Consequently, the
> historic accounting and actuarial methods of St. Paul are
> being conformed to those of Travelers and all St. Paul
> assets and liabilities are being recorded at fair value on the
> opening balance sheet.
>
> St. Paul Travelers will make certain reserve valuation
> adjustments following the merger.  The company has
> requested guidance from the Securities and Exchange
> Commission (SEC) on how an insurance company should
> account for certain reserve valuation adjustments . . . .
>
> The reserve valuation adjustments for which the company
> has sought guidance total $1.625 billion.

* * *

Conforming Adjustments:

Surety reserves -- Travelers and St. Paul used different
approaches in calculating surety reserves.  For example, the
method previously used by St. Paul in its surety business
was to establish claims and claim adjustment expense
reserves for each bond when it is determined that the
individual project is not likely to be completed in accordance
with its terms (i.e., reserves are evaluated on a
project-by-project basis).  Under the Travelers method,
claims and claim adjustment expense reserves are
established when it is determined that a contractor is not
likely to be capable of completing its bonded obligations in
accordance with their respective terms (i.e., reserves are
evaluated on a contractor-by-contractor basis).  The required
adoption of the Travelers method for calculating St. Paul's
surety claims and claim adjustment expense reserves
resulted in an increase in surety reserves of $300 million, net
of reinsurance.  This conforming adjustment also resulted in
a $75 million increase in other liabilities due to a related
reinsurance reinstatement premium.

Construction reserves -- Travelers has a long-established
unit that tracks, disaggregates, and studies construction
claims.  Travelers disaggregated St. Paul's claim data as of
the acquisition date, applied its experience factors to those
claims and developed an estimate of ultimate losses
consistent with Travelers evaluation of loss experience.  This
resulted in an increase of $400 million and $100 million, net
of reinsurance, for prior year reserves related to construction
defect claims and construction wrap-up exposures,
respectively.  Construction defect claims relate
predominately to property damage claims that result from
errors a contractor makes during a project that are not
known until after the project is completed.  Construction
wrap-up exposures relate to insurance programs, such as
workers compensation and general liability, for construction
projects in which all contractors working on such a project
are covered under the programs.

Reserves for uncollectible reinsurance and amounts due
from policyholders and co-surety participants -- The methods
used to calculate reserves for uncollectible reinsurance and

19

reserves for uncollectible amounts due from policyholders and co-surety participants also differed between the two companies. The companies used different default rate charges and different procedures for estimating adjustments, including those related to potential disputed amounts. Adjustments required to conform the historical GAAP accounting methods of St. Paul to those of Travelers resulted in an increase in reserves of $295 million for uncollectible reinsurance and uncollectible amounts due from policyholders and co-surety participations.

Net Strengthening of Surety Reserves Due to Financial Condition of a Construction Contractor:

In response to first quarter developments that included requests for additional advances by a specific construction contractor and that resulted in a first quarter 2004 charge by St. Paul, a comprehensive update of exposure to this construction contractor was completed. Detailed reviews performed by independent engineering and accounting firms resulted in increases in estimates of costs to complete the contractor's existing projects. St. Paul Travelers also performed analyses of the contractor's business and financial condition, the impact of various completion options on the cost to complete bonded projects, liquidated damages, reinsurance recoveries, co-surety participation and collateral. Based upon these analyses, St. Paul Travelers recorded an increase of $250 million to its surety reserves, net of reinsurance and co-surety participation. As described above, the company increased reserves for estimated costs in the event that a co-surety cannot meet its obligations.

Change in Reinsurance Recoverables Due to Commutation of Specific Reinsurance Arrangements:

On June 30, 2004, St. Paul Travelers entered into a commutation with a major reinsurer of certain of St. Paul's reinsurance agreements, in which discussions commenced prior to April 1, 2004. The settlement, which was effective retroactively to April 1, 2004, was for approximately $155 million less than St. Paul's pre-acquisition recoverable on its balance sheet. Under the terns of the agreement, St. Paul Travelers received approximately $867 million in cash from the reinsurer.

20

Net Increase in Other Claims and Claim Adjustment
Expense Reserves:

This $50 million net increase relates to other reserving
changes that are similar in nature but smaller in dollar
amount than those described above.

64.    In response to St. Paul Travelers' July 23, 2004 revelation, A.M. Best Co.

- the leading insurance rating and information source - issued a press release on July

23, 2004, announcing that it had downgraded the debt ratings of St. Paul Travelers. A.

M. Best Co.'s press release explained the ratings downgrade in relevant part:

These rating actions follow today's pre-announcement by St.
Paul Travelers that it would increase reserves by $1.625
billion in second quarter 2004 to be reported on July 28,
2004. These rating actions consider this substantial reserve
increase and its negative effects on statutory earnings,
capital accumulation and holding company cash, which were
not previously anticipated.

From a GAAP accounting standpoint, depending on
guidance from the Securities and Exchange Commission
(SEC), the reserve increase could be recorded through St.
Paul Travelers' income statement and could result in a
substantial net loss for the second quarter, or potentially,
under purchase accounting, be charged directly to St. Paul
Travelers' opening balance sheet and not impact earnings.
Alternatively, some of the charges could be recorded
through the income statement and some directly to the
opening balance sheet. However, under statutory
accounting principles, the charge will be recorded through
the income statement.

The $1.625 billion reserve increase by the St. Paul
Companies in the second quarter 2004 exceeded A.M.
Best's expectations by a sizable margin. The degree and
need for Travelers to financially support the St. Paul
Companies was unanticipated. While St. Paul Travelers has
referred to the $1.625 billion reserve increase as conforming
reserve valuation adjustments, A.M. Best considers nearly
all of the reserve increase to be akin to loss reserve
strengthening. Moreover, statutory earnings, surplus and

21

> holding company cash projections have all been revised downward.

65. Reporting on St. Paul Travelers' required reserve increase, a July 23, 2004 Bloomberg article quoted Wayne Bopp, who helps manage $35 billion at Cincinnati-based Fifth Third Bancorp, as commenting that St. Paul and Travelers "should have realized the shortfall sooner and lowered St. Paul's value in the deal." The article further quoted Bopp as observing, "[w]ho was doing the due diligence? The loss of confidence will hurt for a long time."

66. On August 3, 2004, an article in The Wall Street Journal entitled, "Travelers' Shareholders Get Caught In Storm" observed that "it is becoming increasingly clear that the St. Paul takeover, which was a no-premium deal billed as a 'merger of equals,' has bitten Travelers' stockholders badly." According to the article, "[t]here seems to be little reason why Travelers' executives didn't anticipate problems with St. Paul's insurance methodologies and practices, particularly since Jay Fishman, the current executive officer of the new company, was CEO at St. Paul and had served as a top executive at both Citigroup and Travelers." The article further noted that, "[n]ow investors wonder why Travelers didn't either lower the offering price sharply or walk away from the deal . . . investors are troubled that Travelers seems to have conducted limited and inadequate due diligence in acquiring St. Paul."

67. On August 5, 2004, St. Paul Travelers reported that the required reserve adjustments for St. Paul would be $1.637 billion, resulting in an operating loss of $310 million or $0.47 per basic and diluted share for the Company in the second quarter ended June 30, 2004.

68.     As reported by the <u>Star Tribune</u> on August 12, 2004, "investors and analysts have begun questioning the wisdom of the April 1 merger of the St. Paul Companies Inc. and Travelers Property Casualty Corp." According to the <u>Star Tribune</u> article, "[f]our investment firms, including Lehman Brothers and Goldman Sachs, have lowered their opinion of St. Paul Travelers since late June, citing concerns with the company's balance sheet and earnings quality." The article quoted analyst Michael Paisan at Legg Mason as stating in his research report that "[t]he merger of the two companies was far from a 'merger of equals' and was more representative of a 'bailout' of St. Paul Companies."

69.     The per share closing price of St. Paul common stock was $40.77 on April 1, 2004, the date on which each share of Travelers' Class A and Class B common stock was exchanged for 0.4334 shares of St. Paul common stock. By the time the true extent of required reserve increase and its adverse impacts against St. Paul Travelers were fully disclosed to the market on August 5, 2004, the per share price of St. Paul common stock had declined by $6.02 or 14.77% to close at $34.75 per share on August 5, 2004 - causing massive losses to former Travelers shareholders.

70.     The Defendants' materially false and misleading statements about St. Paul's business, operations, financial results and reserves artificially inflated the per share price of St. Paul common stock. Had the true facts about St. Paul been disclosed to the Travelers shareholders, they would not have voted to approve the Merger or would not have accepted the exchange ratio of 0.4334.

23

## DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT
## ST. PAUL STOCK WAS NOT A PRUDENT PLAN INVESTMENT

71.    At all relevant times, Defendants knew or should have known that St. Paul was engaged in the questionable business practices detailed above which made St. Paul Stock an imprudent Plan investment.

72.    St. Paul, the Committees and the Individual Defendants failed properly to take into account the numerous practices that put St. Paul Stock at risk as well as the fact that St. Paul Stock was inflated in value when determining the prudence of investing and holding Plan assets in St. Paul Stock.

73.    As a result of Defendants, knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification at St. Paul made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

74.    In addition, named and unnamed Defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Committees to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

75.    The Company, the Committees and other individual Plan fiduciary delegates failed to conduct an appropriate investigation into whether St. Paul Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding St. Paul's improper activities so that

24

participants could make informed decisions regarding St. Paul Stock in the Plan, or otherwise failed to protect the Plan and its participants against inevitable losses.

76.     Defendants failure in this regard is particularly acute. As a result of his role as St. Paul's CEO and Board Chairman, Fishman knew or should have known of the Company's improper practices. Yet, upon information and belief, despite his obligation to properly and materially inform participants in the Plan of the true risks involved with holding St. Paul Stock, he remained silent.

77.     An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in St. Paul Stock offered by the Plan, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

78.     Because Defendants knew or should have known that Company stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company stock.

79.     Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Company stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

25

80.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in St. Paul Stock.

## DEFENDANTS REGULARLY COMMUNICATED WITH PARTICIPANTS IN THE PLAN CONCERNING ST. PAUL STOCK OFFERED BY THE PLAN, YET FAILED TO DISCLOSE THE IMPRUDENCE OF INVESTMENT IN COMPANY STOCK

81.   Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock, the single largest single asset in the Plan. During the Class Period, the Company fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan

82.   As noted above, these SEC filings and related Company statements and releases were inaccurate, incomplete and materially misleading, causing Plan participants to purchase and to hold and maintain, Plan investments in St. Paul Stock.

83.   The Company, Committees and or the Plan's individual fiduciary delegates failed to provide Plan participants with complete and accurate information regarding St. Paul Stock, such that the participants could appreciate the true risks

26

presented by investments in St. Paul Stock and could make informed decisions regarding investments in the Plan.

## CLAIMS FOR RELIEF UNDER ERISA

84.     At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A).

85.     ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

86.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

87.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, aid with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

27

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

88.    These fiduciary duties under ERISA § 404(a)(I)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things,

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

(b)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

89.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> ". . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(8), 29 U.S.C. § 1104(a)(I), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary,

unless be makes reasonable efforts under the
circumstances to remedy the breach."

90.     Plaintiff therefore brings this action under the authority of ERISA § 502 for
Plan-wide relief pursuant to ERISA § 409(a) to recover losses sustained by the Plan
arising out of the breaches of fiduciary duties by the Defendants.

## CAUSATION

91.     The Plan suffered at least millions of dollars in losses because substantial
assets of the Plan were imprudently allowed to be put at great risk by Defendants,
through investment by the Plan in St. Paul common stock during the Class Period, in
breach of Defendants' fiduciary duties.

92.     Defendants are responsible for losses caused by participant direction of
investment in St. Paul common stock because Defendants failed to take the necessary
and required steps to ensure effective and informed independent participant control
over the investment decision-making process, as required by ERISA § 404(c), 20
U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants concealed
material, non-public facts from participants, and provided misleading, inaccurate, and
incomplete information to them regarding the nature of the Defendants' illicit activities
and therefore the ongoing earnings levels of St. Paul, as well as the true underlying
values of St. Paul Stock offered by the Plan, misrepresenting its soundness as
investment vehicles.  As a consequence, participants did not exercise independent
control over their investments in St. Paul common stock and Defendants remain liable
under ERISA for losses caused by such investment.

29

93. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in St. Paul common stock and divesting the Plan from Company stock offered by the Plan when maintaining such investment alternatives became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company common stock.

94. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in St. Paul common stock offered by the Plan, eliminating this investment alternative when it became imprudent and divesting the Plan from any then-existing investments in this investment alternatives when maintaining such investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through such continued tainted investment.

## COUNT I

## FAILURE TO PRUDENTLY AND LOYALLY MANAGE PLAN ASSETS
## (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404)

95. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

96. At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

97. As alleged above, the Defendants were all responsible in different ways and to differing extents, for the selection, maintenance and monitoring of the Plan's investment options, including the option of Company Stock.

30

98. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in the Plan were prudent and are liable for losses incurred as a result of such investments being imprudent.

99. Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

100. The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that St. Paul Stock was not a suitable and appropriate investment for the Plan as described herein for either (1) St. Paul Stock purchased through participant contributions to the Plan or (2) St. Paul Stock accumulated by the Plan through Company matching contributions. Nonetheless, during the Class Period, these fiduciaries continued to offer the St. Paul Stock as an investment option for the Plan and to direct and approve Plan investment in St. Paul Stock, instead of in cash or other investments. Moreover, during the Class Period, despite their knowledge of the

31

imprudence of the investment, Defendant failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in St. Paul Stock.

101.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

102.    The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow Defendants' failure to prudently and loyally manage Plan assets in the exercise of their discretion with respect to the offering Company Stock as an investment option in the Plan despite knowing that such failures were breaches of their ERISA mandated fiduciary duties.

103.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

104.    Pursuant to ERISA § 502(a), 29U S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### FAILURE TO MONITOR AND TO PROVIDE ACCURATE INFORMATION(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY ST. PAUL AND THE DIRECTOR DEFENDANTS)

105.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

106.   At all relevant times, as alleged above, St. Paul and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 20 U.S.C. § 1002(21)(A).

107.   At all relevant times, as alleged above, the scope of the fiduciary responsibility of St. Paul and the Director Defendants included the responsibility to monitor other fiduciaries.

108.   The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (the Committees).  In this case, that meant that the monitoring fiduciary, St. Paul and the Director Defendants, had the duty to:

(1)   Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

(2)   Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

(3)   Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

33

(4)     Ensure that the monitored fiduciaries had adequate

information and to do their job of overseeing the Plan investments;

(5)     Ensure that the monitored fiduciaries maintained

adequate records of the information on which they based their decisions and analysis

with respect to Plan investment options; and

(6)     Ensure that the monitored fiduciaries reported

regularly to the Company.  The Company must then review, understand, and approve

the conduct of the hands-on fiduciaries.

109.   Under ERISA, a monitoring fiduciary must ensure that the monitored

fiduciaries are performing their fiduciary obligations, including those with respect to the

investment of plan assets, and must take prompt and effective action to protect the plan

and participants when they are not.  The duty to monitor encompasses a duty to

periodically monitor the performance of the appointees so as to ensure compliance with

their fiduciary duties under ERISA and the plan.

110.   The duty of prudence requires that appointing fiduciaries have procedures

in place so that on an ongoing basis they may review and evaluate whether investment

fiduciaries are doing an adequate job (for example, by requiring periodic reports on their

work and the plan's performance, and by ensuring that they have a prudent process for

obtaining the information and resources they need).  In the absence of a sensible

process for monitoring their appointees, the appointing fiduciaries would have no basis

for prudently concluding that their appointees were faithfully and effectively performing

their obligations to plan participants or for deciding whether to retain or remove them.

34

111.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

112.   St. Paul and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund.  St. Paul and the Director Defendants knew or should have known that the fiduciaries it was responsible for monitoring were imprudently allowing the Plan to continue offering the St. Paul Stock as a Plan investment, and continuing to invest in St. Paul Stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

113.   In addition, as a result of its inappropriate practices and implicit knowledge thereof, St. Paul and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of St. Paul that it knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, Defendants breached their monitoring duties under the Plan and ERISA.

35

114.    St. Paul and the Director Defendants are liable as a co-fiduciaries because: (1) they knowingly participated in the fiduciary breaches by their fellow Defendant-fiduciaries in the activities implicated in this Count; (2) they enabled the breaches by these Defendants; and (3) they had knowledge of these breaches yet failed to make any effort to remedy them.

115.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

116.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### FAILURE TO PROVIDE COMPLETE AND ACCURATE INFORMATION TO PLAN PARTICIPANTS AND BENEFICIARIES (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND 405 OF ERISA)

117.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

118.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

119.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

120.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose

36

information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in Mash Stock.

121.   Because investment in the Plan was not diversified (i.e., the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in St. Paul Stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to St. Paul Stock.

122.   The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding St. Paul Stock. St. Paul's business improprieties, public misrepresentations and inflated earnings, and the consequent artificial inflation of the value of St. Paul Stock and, generally, by conveying inaccurate information regarding the soundness of St. Paul Stock and the prudence of investing retirement contributions in St. Paul equity. These failures were particularly devastating to the Plan and the participants; a heavy percentage of the Plan's assets were invested in St. Paul Stock during the Class Period and thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

123.   Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other

fiduciaries to provide complete and accurate information regarding St. Paul Stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

124.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in St. Paul Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in St. Paul Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

125.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

126.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

38

## COUNT IV

## BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
## (BREACHES OF FIDUCIARY DUTIES IN
## VIOLATION OF ERISA §§ 404 AND 405 OF ERISA)

127.    Plaintiff incorporates the allegations contained in the previous paragraphs
of this Complaint as if fully set forth herein.

128.    At all relevant times, as alleged above, Defendants were fiduciaries within
the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

129.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan
fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a
plan solely in the interest of the participants and beneficiaries and for the exclusive
purpose of providing benefits to participants and its beneficiaries.

130.    Defendants breached their duty to avoid conflicts of interest and to
promptly resolve them by, inter alia, failing to engage independent fiduciaries who could
make independent judgments concerning the Plan's investment in the St. Paul Stock;
failing to notify appropriate federal agencies, including the United States Department of
Labor, of the facts and transactions which made St. Paul Stock an unsuitable
investment for the Plan; failing to take such other steps as were necessary to ensure
that participants' interests were loyally and prudently served; with respect to each of
these above failures, doing so in order to prevent drawing attention to the Company's
inappropriate practices; and by otherwise placing the interests of the Company above
the interests of the participants with respect to the Plan's investment in Company Stock.

131.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's otherwise participants and beneficiaries lost a significant portion of their retirement investment.

132.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

133.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock.

134.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

135.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

136.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the

challenged investment and where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

137.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3): (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

138.   Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.   Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

D.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Company stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price/value of Company stock;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

42

Dated:  December 28, 2004

CHESTNUT & CAMBRONNE, P.A.

By

Jack L. Chestnut #16378
Karl L. Cambronne #14321
3700 Campbell Mithun Tower
222 South Ninth Street
Minneapolis, MN 55402
(612) 339-7300
Fax (612)336-2940

**GAINEY & McKENNA**
Thomas J. McKenna (TJM 7109)
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ, LLP**
Fred Isquith, Esq.
270 Madison avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212) 545-4653

**Attorneys for Plaintiff**